DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
950 Pennsylvania Avenue NW, Room B-200
Washington, D.C. 20530
Telephone:    (771) 217-6091
E-mail:          Leo.Wise@USDOJ.GOV, DEH@USDOJ.GOV
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff,<br><br>    v.<br><br>Alexander Smirnov,<br><br>        Defendant. | 2:24-mj-00166-DJA<br><br>**Government's Memorandum in Support of Detention** |

Certification: This response is timely.

## I.  Introduction

No condition or combination of conditions will reasonably assure the appearance of the defendant Alexander Smirnov as required.  *See* 18 U.S.C. § 3142 (e)(1); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). As discussed in more detail below, the nature and circumstances of the offense, weight of the evidence, and the fact that Smirnov's ties to the community are weak establish that Smirnov should be detained.  But, in addition,

there are four indisputable facts related to the characteristics of Smirnov that compel detention.

First, he claims to have contacts with multiple foreign intelligence agencies and had plans to leave the United States two days after he was arrested last week for a months-long, multi-country foreign trip. During this trip, the defendant claimed to be meeting with foreign intelligence contacts. Those foreign intelligence agencies could resettle Smirnov outside the United States if he were released.

Second, he has access to over $6 million in liquid funds—more than enough money for him to live comfortably overseas for the rest of his life.

Third, Smirnov did not disclose to Pretrial Services his access to these funds. He told Pretrial Services he only had $1,500 in cash-on-hand and $5,000 in a personal checking account. *See* Pretrial Services Report at page 2. As the attached bank statements make clear, as of the end-of-December, Smirnov has access to more than $2.9 million, *see* Exhibit 4 (under seal) and his wife/girlfriend (he refers to her both ways) (hereafter "DL") has access to more than $3.8 million, *see* Exhibit 7 (under seal). The latter's funds are available to him because most of the money in DL's account originated with Smirnov and she pays his personal expenses out of her account; in other words, these appear to be shared funds or funds controlled by Smirnov, regardless of whose name is on the bank account. The fact that Smirnov misrepresented his assets alone should cause Smirnov to be detained because it shows that, at the first opportunity, he did not provide true and complete information to Pretrial Services.

Fourth, as an Israeli citizen, Smirnov can obtain a new passport at any time by visiting an Israeli consulate. The closest Israeli consulate is approximately 5 hours away in Los

Angeles, California.  Thus, even if he turns in his U.S. and Israeli passports, Pretrial Services has no way to prevent him from obtaining a new Israeli passport and leaving the United States using it at any time.

## II.  Statement of Facts and Procedural History

Smirnov was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI").  Indictment ¶ 2.  As a CHS, Smirnov was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.  *Id*.

Smirnov was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022 and 9/29/2023.  *Id*. at ¶ 4.

In addition, when Smirnov was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)."  *Id*. at ¶ 5.  When Smirnov was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020.  *Id*.

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, Smirnov provided false derogatory information

to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America.  *Id.* at ¶ 6.

In March 2017, Smirnov reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange.  *Id.* at ¶ 6(a).  In reporting that conversation to the Handler, Smirnov also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known.  *Id.*

Three years later, in June 2020, Smirnov reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]."  *Id.* at ¶ 6(b).

Smirnov also reported two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1.  *Id.* at ¶ 6(c).

The events Smirnov first reported to the Handler in June 2020 were fabrications. *Id.* at ¶ 6(d). In truth and fact, Smirnov had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office. *Id.* In short, Smirnov transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy. *Id.*

When he was interviewed by FBI agents in September 2023, Smirnov repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after he said he met with Russian officials. *Id.* at ¶ 6(e).

On February 14, 2024, a federal grand jury in the Central District of California returned a two-count indictment charging Smirnov with one count of making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001 (Count One) and; one count of fabricating information in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Two). *United States v. Smirnov*, Cr. No. 2:24-cr-00091-ODW (C.D. Cal. Feb. 14, 2024, ECF 1).

That same day, Smirnov was arrested in the District of Nevada as he returned to the United States on an international flight. Smirnov was scheduled to leave the United States two days later, on February 16, 2024, for a months-long, multi-country trip that, by his own description, involved meetings with officials of foreign intelligence agencies and governments. During his custodial interview on February 14, Smirnov admitted that officials

associated with Russian intelligence were involved in passing a story about Businessperson 1.

On February 15, 2024, Smirnov had an initial appearance in the District of Nevada. At that time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(a) and (b) on the basis that Smirnov posed a serious risk of flight and a serious risk of obstruction of justice. The Government requested a three (3) day continuance of the detention hearing, pursuant to 18 U.S.C. § 3142(f)(2). A detention hearing is scheduled for February 20, 2024.

### III.  Points and Authorities

The facts before the Court establish that there are no conditions or combination of conditions that will reasonably assure Smirnov's appearance. Therefore, Smirnov should be detained pending trial.

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). Title 18, United States Code, Section 3142 (hereafter the "Bail Reform Act") specifically provides, in relevant part, that "the judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required" consider the following factors:

(1) the nature and circumstances of the offense charged …;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; …

18 U.S.C. § 3142(g); *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015).

A finding that that there are no conditions that will reasonably assure a defendant's

appearance need only be established by a preponderance of the evidence. *Santos-Flores*,

794 F.3d at 1090; *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); *Motamedi*,

767 F.2d at 1407. "More finely put, this means that the Government must demonstrate

that it is more likely than not that there is a serious risk that the defendant will flee,

not that it is more likely than not that the defendant will flee." *United States v. Figueroa-

Alvarez*, No. 4:23-CR-00171-DCN, 2023 WL 4485312, at *5 (D. Idaho July 10, 2023);

*see United States v. Duarte-Vela*, No. 2:23-cr-00009-TOR-1, Amended Order Following

Status Hearing Regarding Detention and Detention Hearing at 7 (Dkt. 32) (E.D. Wa.

Jan. 25, 2023); *Alvarenga-Canan*, No. 1:23-cr-00042-BLW, Tr. at 7 (Dkt. 26) ("It's got

to be 51 percent of a serious risk.").

**A.    Smirnov is charged with lying to law enforcement and fabricating evidence.**

The nature and circumstances of the offense make clear that there are no conditions

of release that will reasonably assure the appearance of Smirnov.  Pretrial supervision is, at

its core, based on trust.  Pretrial Services must trust a defendant to abide by the conditions

the court imposes and to accurately report information requested by Pretrial Services as they

attempt to police those conditions.  The circumstances of the offenses charged—that Smirnov

lied to his FBI Handler after a 10-year relationship where the two spoke nearly every day—

means that Smirnov cannot be trusted to provide truthful information to Pretrial Services.

Critically, Smirnov lied to his FBI Handler after repeated admonishments that the

information he provided to the FBI must be truthful.  And the false information he provided

was not trivial.  It targeted the presumptive nominee of one of the two major political parties

7

in the United States.  The effects of Smirnov's false statements and fabricated information continue to be felt to this day.  Now the personal stakes for Smirnov are even higher.  His freedom is on the line.  If he could not be trusted to report truthful information to his FBI Handler, he cannot be trusted to report truthful information to Pretrial Services.

**B.     The weight of the evidence against Smirnov is strong.**

As described in the indictment, the evidence against Smirnov is strong.

Smirnov is charged with lying to the FBI about two meetings in late 2015/2016 and two phone calls in 2016/2017 and 2019.  Specifically, Smirnov told the FBI in 2020 that "in late 2015/2016 during the Obama/Biden Administration" he first met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems."  Indictment at ¶ 24.

Smirnov also claimed that he met with Burisma Official 1 "one or two months later," around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million each so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with [the then-Ukrainian Prosecutor General]."  *Id.*

The evidence at trial will establish that no such statements were made to Smirnov because, in truth and fact, Smirnov met with officials from Burisma for the first time in 2017, after Public Official 1 left office in January 2017, and after the then-Ukrainian Prosecutor General had been fired in February 2016.  *Id.* at ¶29.  The evidence at trial will show

Smirnov's story to the FBI was a fabrication, an amalgam of otherwise unremarkable business meetings and contacts that had actually occurred but at a later date than he claimed and for the purpose of pitching Burisma on Smirnov's services and products, not for discussing bribes to Public Official 1 when he was in office.

Smirnov began to pursue business opportunities with Burisma in spring 2017, at the earliest, through two associates of his. *Id*. at ¶30. Associate 1 was a Ukrainian business consultant. *Id*. at ¶ 30(a). He was introduced to Smirnov by a mutual acquaintance who told Associate 1 that Smirnov was an expert in IPOs in the United States. *Id*. Smirnov and Associate 1 subsequently met in Kiev, Ukraine, and Smirnov asked Associate 1 to connect him to businesses in Ukraine interested in IPOs in the United States. *Id*. Associate 1 subsequently identified Burisma as such a company. *Id*. Associate 2 was an American who owned a cryptocurrency business. *Id*. at ¶ 30(b). In the spring of 2017, Smirnov presented Burisma to Associate 2 as a company that might be interested in a cryptocurrency product Associate 2 was trying to commercialize. *Id*. Around this time, Smirnov sent Associate 2 a link to the Board of Directors of Burisma. *Id*. Smirnov specifically called out the fact that Businessperson 1 was on the Board and indicated that because Businessperson 1 was on the Board, Smirnov thought Burisma was a company with which they could do business. *Id*.

Between March 2017, when Smirnov first reported on Burisma to the Handler, and June 2020, when he first made his false claims about bribes paid to Public Official 1 when he was in office, directly and through his son Businessperson 1, Smirnov had a series of routine business contacts with executives at Burisma. *Id*. at ¶ 31. All of these contacts occurred in 2017 and 2018, when Public Official 1 was out of office and after the then-Ukrainian Prosecutor General had been fired. *Id*.

The same day that he first reported on Burisma, March 1, 2017, Smirnov messaged the Handler a photograph of a business card for Burisma Official 2.  *Id.* at ¶ 31(a).



In response, on that same day, the Handler asked Smirnov, "How's [Burisma Official 2] fit into the story", to which Smirnov responded, "This is the guy that will do the public company from there [sic] side." *Id.* at ¶ 31(b).

The Handler then messaged Smirnov, "Looks like the CEO or Owner might be [Burisma Official 1] or []. Either sound familiar?", to which Smirnov responded with the first name of Burisma Official 1. *Id.* at ¶ 31(c). The Handler then asked Smirnov whether he was meeting with Burisma Official 1, to which Smirnov responded, "No. The guy that I send [sic] you the business card." *Id.*

On April 13, 2017, the Handler messaged Smirnov asking him, "U know who from Burisma will be in the meeting," to which Smirnov responded, "Not yet Will know after we [sic] I will get the email." *Id.* at ¶ 31(d).

Four days later, on April 17, 2017, Associate 1 sent Smirnov and Burisma Official 2 an email introducing them to each other. *Id.* at ¶ 31(e).

That same day, Associate 1 sent another email to Burisma Official 2 summarizing, in general terms, how a company could undertake an IPO in the United States. *Id.* at ¶ 31(f).

On or about April 27, 2017, Burisma Official 2 responded to Associate 1's April 17, 2017, email. Burisma Official 2 thanked Associate 1 for introducing him to Smirnov and promised to send Smirnov and Associate 1 information about Burisma's desire to buy an oil and gas company in the United States. *Id.* at ¶ 31(g).

On or around May 11, 2017, Burisma Official 4, another Burisma executive, emailed Associate 1 telling him that Burisma was not interested in pursuing an IPO in the United States and that their priority was acquiring a U.S.-based oil and gas company. *Id.* at ¶ 31(h).

Seven days later, on or about May 18, 2017, Associate 1 forwarded Burisma Official 4's email to Smirnov. *Id.* at ¶ 31(i).

On July 24, 2017, Smirnov messaged the Handler, "Cutting a deal with Burisma  Will update you soon bro" and "It's gonna be a contract so we can review it first." *Id.* at ¶ 31(j).

On September 16, 2017, Associate 2, the individual whom Smirnov claimed in the 2020 1023 attended the first meeting Smirnov had with Burisma executives in late 2015 or early 2016, flew from New York to Kiev, via London. *Id.* at ¶ 31(k). Associate 2 remained in Ukraine until September 23, 2017, when he returned to the United States through London. *Id.*

During the six (6) day period that Associate 2 was in Ukraine, he and Smirnov met with representatives from Burisma, including Burisma Official 3, the daughter of Burisma's owner Burisma Official 1, to discuss a cryptocurrency product. *Id.* at ¶ 31(l). The meeting

was in Russian, and on the drive back from Burisma's headquarters, Smirnov described to Associate 2 what had been discussed. *Id.* Smirnov told Associate 2 that the Burisma representatives were not interested in the cryptocurrency product Smirnov and Associate 2 were selling and were instead trying to find an oil and gas company in the United States that Burisma could purchase. *Id.* Smirnov did not describe to Associate 2 any discussion of Businessperson 1 or Public Official 1 during this meeting. *Id.*

On September 19, 2017, Smirnov messaged the Handler photographs of business cards for Burisma Official 3, the person Smirnov claimed he met at the first meeting in late 2015 and or 2016 during the Obama-Biden Administration, and Burisma Official 4, the individual who had sent an email to Associate 1, which Associate 1 then forwarded to Smirnov, in May 2017, as described above. *Id.* at ¶ 31(m).



After the September 2017 meeting, Associate 2 prepared a document outlining steps that Burisma could take in order to acquire a company in the United States and use it for an IPO. *Id.* at ¶ 31(n). Associate 2 sent this document to Smirnov on September 22, 2017. *Id.*

Associate 2's trip to Kiev in September 2017 was the first time he had left North America since 2011. *Id.* at ¶ 31(o). Associate 2's travel records conclusively establish that fact. Thus, he could not have attended a meeting in Kiev, as Smirnov claimed, in late 2015

or early 2016, during the Obama-Biden Administration. *Id.* His trip to Ukraine in September 2017 was more than seven months after Public Official 1 had left office and more than a year after the then-Ukrainian Prosecutor General had been fired. *Id.*

On January 23, 2018, Associate 2 flew from Los Angeles to London. *Id.* at ¶ 31(p). During the previous week, on January 16, 2018, Smirnov messaged Associate 2 asking him, "Brother Send me the name of the place in London please," to which Associate 2 replied, "Baglioni." *Id.* On January 25, 2018, Smirnov attempted to call Associate 2. *Id.* Associate 2 responded, "Downstairs getting breakfast," and Smirnov responded, "Cool. See you in a few." *Id.* Both Smirnov and Associate 2 were staying at the Hotel Baglioni in London at that time. *Id.* When Associate 2 was with Smirnov in London, Smirnov told Associate 2 that he had received a call from the owner of Burisma, Burisma Official 1, and that Burisma Official 1 was interested in doing business with them. *Id.*

On January 26, 2018, Associate 2 flew from London to Kiev, staying until January 30, 2018. *Id.* at ¶ 31(q).

During that five (5) day period, Smirnov and Associate 2 traveled to Burisma's headquarters. *Id.* at ¶ 31(r). Once there, they had a brief meeting with Burisma Official 2, who told them that Burisma was not interested in their cryptocurrency product. *Id.* Burisma Official 2 spoke English during the meeting, and Associate 2 was able to participate. *Id.* At no point during this meeting between Smirnov, Associate 2, and Burisma Official 2 did Burisma Official 2 tell Smirnov that Burisma had hired Businessperson 1 to "protect us, through his dad, from all kinds of problems." *Id.*

All the contacts that Smirnov had with Burisma occurred no earlier than spring 2017, after the end of the Obama-Biden Administration. *Id.* at ¶ 32. Notably, Smirnov was only

introduced to Burisma Official 2, via email, on or about April 17, 2017.  *Id.*   Therefore, Smirnov's claim that he had met with Burisma Official 2 in "late 2015 or 2016, during the Obama/Biden administration," was false because if Smirnov had met Burisma Official 2 then, he would not have needed Associate 1 to introduce him to Burisma Official 2 in April 2017, and Burisma Official 2 would not have thanked Associate 1 for introducing them in April 2017.  *Id.*

As to the second meeting, the one that supposedly happened in Vienna, contrary to what Smirnov told the Handler, Associate 1 did not meet with Smirnov and Burisma Official 1 at a café in Vienna around the time that Public Official 1 "made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015.  *Id.* at ¶ 33.  In fact, Associate 1 has never met or spoken with Burisma Official 1.  *Id.*

Further, based on his own travel records, Smirnov did not travel to Vienna "around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015.  *Id.* at ¶ 34.

As to the two phone calls Smirnov claimed to have in "2016/2017" and 2019, Smirnov told his Handler that Burisma Official 1 said he was "pushed to pay" Public Official 1 and Businessperson 1, had text messages and recordings that show he was coerced to make such payments, and it would take investigators ten years to find the records of illicit payments to Public Official 1.   *Id.* at ¶57(c) and (d).  When Smirnov was interviewed by the FBI in September 2023, he reversed himself and said he did not speak to Burisma Official 1 on the

phone after they met in a German speaking country in early 2016.  *Id.* at ¶ 49.  Further, Associate 1 has never spoke to Burisma Official 1.  *Id.* at ¶ 36.

In sum, Smirnov's own travel records, emails and messages with his Handler, along with emails and travel records of the individuals who Smirnov claimed to have attended the two meetings with him, will all be used as evidence against him.  Further, the individuals who participated in these meetings and phone calls will refute that there was ever any discussion of Public Official 1 or Businessperson 1 in those meetings or any phone calls at all.

**C.    The history and characteristics of Smirnov make clear that no conditions can reasonably assure his appearance.**

Smirnov's personal history and characteristics also weigh in favor of detention. Smirnov has very weak ties to the community in Las Vegas.  He has only lived in Las Vegas since 2022.  Pretrial Services Report at 1.  The condominium where he lives is owned by DL, a fact about which he lied, as will be addressed below.  Exhibit 1 (under seal).  He has no family in Las Vegas.  To the contrary, he reports that his mother, father, and sister all reside in Israel.  *Id.*  Smirnov lived in Israel from 1992 to 2006, longer than he has lived in the United States.  *Id.*  He does not report any employment that is located in Las Vegas.  Instead, he claims to have a "security business," that is registered in California, where he used to live. *See* Pretrial Services Report at 2.  DL, with whom he lives, does not appear to even know what he does.  *Id.*  Nor do his bank records reflect that he is in the "security business," as he claims.  *Id.*  Instead, the statements for the accounts he controls show large wire transfers from what appear to be venture capital firms and individuals.  *See* Exhibit 4 (under seal).

1.  <u>Smirnov claims to have contact with foreign intelligence agencies</u>.

While Smirnov has no ties to the community in Las Vegas, what he does have is extensive foreign ties, including, most troublingly and by his own account, contact with foreign intelligence services, including Russian intelligence agencies, and has had such contacts recently.  Smirnov could use these contacts to resettle outside the United States.

As noted, law enforcement knows about Smirnov's contact with officials affiliated with Russian intelligence because Smirnov himself reported on a number of those contacts to his FBI Handler.  As described below, these contacts are extensive and extremely recent, and Smirnov had the intention of meeting with one of these officials on his upcoming planned overseas travel.

Of particular note, Smirnov has reported numerous contacts with Russian Official 1, who has been described by Smirnov in a number of ways, including as the son of a former high-ranking Russian government official, someone who purportedly controls two groups of individuals tasked with carrying out assassination efforts in a third-party country, a Russian representative to another country, and as someone with ties to a particular Russian intelligence service.  This latter fact was reported by Smirnov in October, 2023.

In December 2023, Smirnov reported to his Handler about a recent overseas trip, where Smirnov attended a meeting with Russian Official 2, who Smirnov has described as a high-ranking member of a specific Russian foreign intelligence service.   According to Smirnov, the purpose of the meeting was to discuss a potential resolution to Russia's war against Ukraine.  During this same trip, Smirnov apparently attended a separate meeting with Russian Official 1, the individual who controls groups that are engaged in overseas assassination efforts.  During this meeting with Russian Official 1, Russian Official 1 claimed

that another individual, Russian Official 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located at a particular hotel. Smirnov told the FBI Handler that the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent U.S. persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.  As described below, this story, which again was relayed by Smirnov to his Handler in/about December, 2023, appears to mirror the story that Smirnov was pushing on investigators and prosecutors during their meeting with him in September, 2023 (in which Smirnov pushed investigators to look into whether Businessperson 1 had been recorded in a foreign hotel).

Most recently, Smirnov has reported:

a.  Meetings in or about December 2023, outside the United States, between top officials of another country and Russian officials;

b.  Contact with a Russian official on November 27, 2023, where the Russian official provided Smirnov with information on his knowledge of certain Russian military operations in a third country; and

c.  Contact with a Russian intelligence service operative and top Russian representative to a third country on November 8, 2023.

Exhibit 2.

The following is a declassified summary of additional contacts that predate the contacts referenced above and in Exhibit 2.  This summary was prepared by the FBI and taken from several reports he made to the FBI:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1. (U//FOUO) (Document 1)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV was invited to and planned to attend the birthday party of an identified individual in the Middle East, COUNTRY A, which would include activities on a mega yacht owned by a high-ranking member of Russia's largest steel and mining company. SMIRNOV provided the names of individuals who might attend the birthday activities, including RUSSIAN OFFICIAL 1, who he identified as the son of a high-ranking former Russian government official, and RUSSIAN INDIVIDUAL 1, a high-ranking member of a Russia state-owned defense conglomerate.

2. (U//FOUO) (Document 2)
   a. (U//FOUO) In or about January 2023, SMIRNOV reported the following:
      i. (U//FOUO) In December 2022, SMIRNOV learned from a Russian Foreign Intelligence official the whereabouts of a particular Russian Foreign Intelligence officer living outside of Russia.
      ii. (U//FOUO) In or about January 2023, SMIRNOV spoke to another Russian Foreign Intelligence officer who provided the first name of the Russian Foreign Intelligence officer living outside of Russia.

3. (U//FOUO) (Document 3)
   a. (U//FOUO) On or about August 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV had been introduced to RUSSIAN INDIVIDUAL 2, a high-ranking member of a Russian steel company. RUSSIAN INDIVIDUAL 2 was organizing a birthday party for another person on RUSSIAN INDIVIDUAL 2's mega yacht. RUSSIAN INDIVIDUAL 2 mentioned that two of the oligarchs who would be attending the party have "connections" or "business ties" to a high-ranking member of a Russian Foreign Intelligence Service, RUSSIAN OFFICIAL 2. Because of the language used by RUSSIAN INDIVIDUAL 2, SMIRNOV was not clear about the precise nature of the relationship between the identified Russian oligarchs and RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

4. (U//FOUO) (Document 4)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following information (this information was provided to supplement Document 1):
      i. (U//FOUO) The planned COUNTRY A birthday party may be attended by RUSSIAN OFFICIAL 1, the son of a former high-ranking Russian government official. An associate of SMIRNOV

provided SMIRNOV with a copy of RUSSIAN OFFICIAL 1's passport.

5. (U//FOUO) (Document 5)

    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:

        i. (U//FOUO) SMIRNOV learned from RUSSIAN OFFICIAL 1 himself, that RUSSIAN OFFICIAL 1 has direct access to the highest levels of the Russian government. Although RUSSIAN OFFICIAL 1's father was a former high-ranking government official in Russia, RUSSIAN OFFICIAL 1's access to the highest levels of the Russian government is direct, and not through his father.

        ii. (U//FOUO) RUSSIAN OFFICIAL 1 is a top, unofficial representative of Russia to COUNTRY B.

        iii. (U//FOUO) SMIRNOV provided a photograph of RUSSIAN OFFICIAL 1 taken in or about November 2023, during RUSSIAN OFFICIAL 1's visit to COUNTRY A.

6. (U//FOUO) (Document 6)

    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:

        i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

        ii. (U//FOUO) SMIRNOV provided information about RUSSIAN OFFICIAL 4's chain of command. SMIRNOV named three individuals who have direct, immediate access to the highest levels of the Russian government, including the father of RUSSIAN OFFICIAL 1.

7. (U//FOUO) (Document 7)

    a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information (which is also reported in Document 6).

        i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

8. (U//FOUO) (Document 8)

    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:

        i. (U//FOUO) In October 2023, SMIRNOV had in-person conversations with RUSSIAN OFFICIAL 1 overseas. During these conversations, RUSSIAN OFFICIAL 1 discussed his knowledge

and seeming control of two groups of Russian operatives who were previously tasked with the assassination of a high-ranking official of COUNTRY C.  RUSSIAN OFFICIAL 1 offered to stop the assassination efforts in exchange for certain things, including an agreement by COUNTRY C to stop targeting civilian-family-members of certain Russian officials living in Moscow.

  ii. (U//FOUO) RUSSIAN OFFICIAL 1 also provided SMIRNOV with specific information about Russia's military resources for a winter attack in COUNTRY C. RUSSIAN OFFICIAL 1 also told SMIRNOV about the Russian government's intentions for their war in Ukraine.

9. (U//FOUO) (Document 9)

   a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information:

   i. (U//FOUO) SMIRNOV attended a meeting in COUNTRY A in December 2023 that was attended by RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service. The primary purpose of the meeting was to discuss a potential resolution to the Russia-Ukraine war.

   ii. (U//FOUO) On this same trip, SMIRNOV attended another meeting with, among others, RUSSIAN OFFICIAL 1.

   iii. (U//FOUO) Unrelated to the above, SMIRNOV had a separate conversation with RUSSIAN OFFICIAL 1, wherein RUSSIAN OFFICIAL 1 claimed that RUSSIAN OFFICIAL 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located on a particular floor of HOTEL 1, which is in COUNTRY C. SMIRNOV stated the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent US persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.

   iv. (U//FOUO) SMIRNOV later had a meeting with another COUNTRY C government official, who stated it was common knowledge that the Russian Intelligence Service did, in fact, run such intelligence operations at HOTEL 1.

10. (U//FOUO) (Document 10)

   a. (U//FOUO) In or about February 2022, SMIRNOV provided the following information:

   i. (U//FOUO) When SMIRNOV was working in COUNTRY D circa 2002, he conducted a joint operation to recruit two individuals: 1) RUSSIAN OFFICIAL 5, Russian consular to COUNTRY D, who was caught spying; and, 2) a COUNTRY E consular to COUNTRY D.

ii. (U//FOUO) SMIRNOV first met RUSSIAN OFFICIAL 5 at an event/party COUNTRY D put on for foreign officials. Thereafter, SMIRNOV spent numerous months developing a "friendship" with RUSSIAN OFFICIAL 5. After some time, SMIRNOV was asked by COUNTRY D to contact RUSSIAN OFFICIAL 5 and tell them that COUNTRY D had info that RUSSIAN OFFICIAL 5 was spying. Rather than arresting/PNGing RUSSIAN OFFICIAL 5, COUNTRY D told RUSSIAN OFFICIAL 5 had to leave within 48 hours or there would be "adverse consequences", but that RUSSIAN OFFICIAL 5 should keep in touch with COUNTRY D and SMIRNOV. Thereafter, RUSSIAN OFFICIAL 5 would occasionally provide SMIRNOV with information. RUSSIAN OFFICIAL 5 never provided information that was "adverse" to Russia.

iii. (U//FOUO) Approximately three years before the time of this reporting, possibly in 2019, SMIRNOV traveled to Russia and met with RUSSIAN OFFICIAL 5. They had a very careful, coded conversation about what Russia might look like under different leadership. For background, SMIRNOV understood that RUSSIAN OFFICIAL 5's spouse is somehow related to RUSSIAN OFFICIAL 6, a former high-ranking member of a Russian Intelligence Service. SMIRNOV has never met RUSSIAN OFFICIAL 6, however SMIRNOV once called RUSSIAN OFFICIAL 5 who was in the car at the time with RUSSIAN OFFICIAL 6, who spoke very briefly to SMIRNOV over speaker phone.

iv. (U//FOUO) During a subsequent meeting two days later, SMIRNOV and RUSSIAN OFFICIAL 5 spoke again about matters pertaining to Russia. RUSSIAN OFFICIAL 5 indicated that RUSSIAN OFFICIAL 6 was not happy with Russian leadership, and that RUSSIAN OFFICIAL 6 was also close friends/associates with RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

v. (U//FOUO) First call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): Prior to a recent overseas trip, SMIRNOV contacted RUSSIAN OFFICIAL 5 to see if he could arrange to have RUSSIAN OFFICIAL 2, speak to a high-ranking official of COUNTRY C. SMIRNOV contacted RUSSIAN OFFICIAL 5 and provided him with a proposed date and time for RUSSIAN OFFICIAL 2 to call. SMIRNOV obtained a "throw-phone" and foreign SIM card and provided RUSSIAN OFFICIAL 5 with the number. SMIRNOV indicated that a call subsequently took place between RUSSIAN OFFICIAL 2 and a high-ranking official COUNTRY C, the subject matter of which SMIRNOV was aware.

vi.  (U//FOUO) Second call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): In January 2022, SMIRNOV had a second call with RUSSIAN OFFICIAL 2 (SMIRNOV used a second throw phone). SMIRNOV asked RUSSIAN OFFICIAL 2 for a "favor"—namely that Russian troops do not hurt SMIRNOV's associate, an official of COUNTRY C. RUSSIAN OFFICIAL 2 asked what SMIRNOV thought of SMIRNOV's associate.  SMIRNOV later reiterated his "ask" that his associate not be harmed during any Russian incursion. RUSSIAN OFFICIAL 2 said he was told by RUSSIAN OFFICIAL 5, who SMIRNOV "befriended" years earlier after RUSSIAN OFFICIAL 5 was caught spying, that SMIRNOV was a "good guy," and therefore RUSSIAN OFFICIAL 2 would help to ensure SMIRNOV's associate was not killed or harmed.

vii.  (U//FOUO) Third call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): After SMIRNOV returned from his overseas trip, he again asked RUSSIAN OFFICIAL 5 to set up another call with RUSSIAN OFFICIAL 2. During the call, SMIRNOV discussed the additional escalation of Russian troops along the Ukraine border and asked RUSSIAN OFFICIAL 2 whether he could provide any details about Russia's intentions.  RUSSIAN OFFICIAL 2 stated he was 99% that only a skirmish would occur.

11. (U//FOUO) Document 11
   a.  (U//FOUO) In or about October 2023, SMIRNOV provided the following information:
      i.  (U//FOUO) Photo of passport of RUSSIAN OFFICIAL 1.
      ii.  (U//FOUO) In October 2023, SMIRNOV advised that RUSSIAN OFFICIAL 1, the son of a high-ranking former Russian government official, was invited to attend a birthday party in October 2023 in COUNTRY A, which will be held on RUSSIAN INDIVIDUAL 2's mega yacht. SMIRNOV received a copy of RUSSIAN OFFICIAL 1's Russian passport.

Smirnov's anticipated travel from the United States, on Friday of last week, two days after his return, was for the purpose of meeting with Russian intelligence officials, among others.  Specifically:

12. (U//FOUO) Document 12
   a.  (U//FOUO) In or about January 2024, SMIRNOV provided the following information. The information was recorded in an FD-1040a, CHS travel/ET Activity Request Form.

i.   SMIRNOV reported future travel and meeting itineraries to his FBI Handler, which outlined travel to various countries in February 2024. SMIRNOV planned to meet with RUSSIAN OFFICIAL 1, an operative of a Russian Intelligence Service. The primary purpose of the meeting with RUSSIAN OFFICIAL 1 was to discuss the exchange of Russian and Ukrainian military prisoners. The meeting was set to occur in COUNTRY A.

Smirnov's contacts with Russian officials who are affiliated with Russian intelligence services are not benign.  At his meeting with FBI investigators in September 2023, Smirnov pushed a new story about Public Official 1 and Businessperson 1, as described in the indictment.  Indictment at ¶51.  Specifically, Smirnov wanted them to look into whether Businessperson 1 was recorded in a hotel in Kiev called the Premier Palace.  *Id*.  Smirnov told investigators that the entire Premier Palace Hotel is "wired" and under the control of the Russians.  *Id*.  Smirnov claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel.  *Id*. Investigators know that Smirnov's new story is false because Businessperson 1 has never travelled to Ukraine.  *Id*. at ¶ 54.

Smirnov suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians.  *Id*. at ¶ 52.  Smirnov claimed to have obtained this information a month earlier by calling a high-level official in a foreign country.  *Id.*  Smirnov also claimed to have learned this information from four different Russian officials.  *Id.*

Smirnov told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent.  *Id*. at ¶ 53.  These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. Smirnov told investigators he is involved in negotiations over ending the war and had been

23

for the previous four months. *Id.* According to Smirnov, the Russians want Ukraine to assist in influencing the U.S. election, and Smirnov thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. *Id.* Smirnov told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel. *Id.*

Thus, Smirnov's efforts to spread misinformation about a candidate of one of the two major parties in the United States continues. The Court should consider this conduct as well when evaluating his personal history and characteristics. What this shows is that the misinformation he is spreading is not confined to 2020. He is actively peddling new lies that could impact U.S. elections after meeting with Russian intelligence officials in November. In light of that fact there is a serious risk he will flee in order to avoid accountability for his actions.

2. Smirnov has access to millions of dollars that he did not disclose to Pretrial Services.

Smirnov has already demonstrated that he cannot be trusted to provide truthful information to Pretrial Services. When he was interviewed, he told Pretrial Services that he only had access to $1,500 in cash and another $5,000 in a checking account. *See* Pretrial Services Report at 2.

That is not true. Smirnov is the sole signatory on a Bank of America business checking account ending with 3928 in the name of Avalon Group Inc. (hereafter "BOA 3928") Exhibit 3 (under seal). *As of December 31, 2023, BOA 3928 had a balance of $2,917,496.61.* Exhibit 4 (under seal). The fact that Smirnov lied to Pretrial Services in his very first interaction with them establishes conclusively that there are no conditions that could

reasonably assure his appearance.  That is because the effectiveness of any condition or combination relies on Pretrial Services ability to obtain truthful information from Smirnov.

Smirnov uses BOA 3928 to fund his and DL's lifestyle, although the transfers themselves look like payments from a business, "Avalon Group, Inc." to DL.  From February 2020, when the account was opened, through December 31, 2022, Smirnov withdrew $1,737,500 to purchase cashier's checks in the name of "Avalon Group Inc." and payable to DL.  *Id*.  Those cashier's checks were then deposited in DL's account, in some cases within 30 minutes of Smirnov withdrawing the funds to purchase the checks.  *See* Exhibit 10 (under seal).  DL deposited these cashier's checks into one of her accounts at a branch near where Smirnov withdrew the funds.  *Id*.  For example, on October 13, 2020, a withdrawal was conducted by Avalon Group Inc. in the amount of $599,000 from BOA 3928. Exhibit 5 (under seal).  The transaction was conducted at a Bank of America branch located in San Juan Capistrano, California. *Id*.  A handwritten note on the withdrawal slip identified "CADL XXXX349 4/26/2022," which was Smirnov's California driver's license. *Id*.  Immediately following the withdrawal, Bank of America official check 1145711247 in the amount of $599,000 payable to DL was purchased using the funds. Exhibit 6 (under seal). On October 14, 2020, Bank of America official check 1145711247 was deposited to DL's Wells Fargo account ending 1356, for which she is the sole signer. *Id*.  The transaction was conducted at a Wells Fargo branch located in San Juan Capistrano, California.  *Id*.  The withdrawal from BOA 3928 was funded by a previous wire transfer of $600,000 received from Economic Transformation Technologies Corporation on September 22, 2020.  The BOA 3928 account balance prior to receipt of the wire transfer was approximately $31.

Smirnov also wired DL $785,000 in two payments, $740,000 at the end of 2020 and another $45,000 at the end of 2022. Exhibit 4 (under seal).

*As of February 1, 2024, DL had $3,827,460 in her Wells Fargo account ending in 1356.* Exhibit 7 (under seal).

In 2022 and 2023, after Smirnov began making these substantial transfers to DL, albeit using cashier's checks that make it appear she is receiving the funds from a business, "Avalon Group Inc.," DL made payments to Smirnov's Citi credit card, which is the primary means by which he pays personal expenses. *See* Exhibit 10 (under seal). Specifically, in 2022, DL paid $108,916.52 towards Smirnov's Citi credit card debt and in 2023, she paid $275,869.44. *Id.*

Smirnov told Pretrial Services that he lives with DL in a condominium she leases. *See* Pretrial Services Report at 1. That is also not true. The attached report shows she is in fact the owner, having purchased it on February 28, 2022, for the sale price of $1,425,000. *See* Exhibit 1 (under seal). In February 2022, DL purchased a condominium in Las Vegas where she and Smirnov reside. *Id.* While the condominium is titled in her name, she purchased it after receiving more than $2.4 million from Smirnov. *See* Exhibit 10 (under seal).

Smirnov also withdrew $174,219 in cash from the account, including $60,304.25 in 2023. Exhibit 4 (under seal). In addition to DL paying his personal expenses, Smirnov also pays various personal expenses out of this account including gasoline, credit card payments, restaurants, duty free shopping and others. *Id.*

The government assumes that Smirnov did not disclose these substantial assets to the Court when he submitted his financial affidavit. That is because while the government has not seen the affidavit, the Court appointed the Office of the Federal Public Defender to

represent Smirnov at his initial appearance.  The court specifically admonished Smirnov that he was submitting his financial affidavit under the penalties of perjury.  If he did not disclose his substantial assets the this is a second example of an instance where Smirnov lied to the Court.

In the event that Smirnov did not disclose these assets, the government respectfully requests that the Court release the affidavit to the government so that the government can consider whether to charge Smirnov with perjury.

3.  Smirnov can obtain an Israeli passport at any time.

Finally, the Court should also consider that Smirnov is a dual national who holds both U.S. citizenship, and a U.S. passport, and Israeli citizenship, and an Israeli passport. While Smirnov can be ordered to turn both passports in to Pretrial Services and could be prohibited from obtaining a new U.S. passport, he cannot be prohibited from obtaining a new Israeli one.  He can obtain a new Israeli passport in the United States by visiting any one of Israel's consulates in Washington, DC, New York, Houston, Miami or Los Angeles. *See* Exhibits 8 and 9.

## IV.  Conclusion

Based on the above, this Court should conclude that no condition or combination of conditions will reasonably assure the appearance of the Smirnov as required and order him detained pending trial.

Respectfully submitted this 20th day of February, 2024.

Respectfully submitted,

DAVID C. WEISS
Special Counsel

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice